1  ANDRÉ BIROTTE JR.
   United States Attorney
2  CHRISTINE C. EWELL
   Assistant United States Attorney
3  Chief, Criminal Division
   RICHARD E. ROBINSON (Cal. State Bar No.: 09840)
4  Assistant United States Attorney
   Major Frauds Section
5        1100 United States Courthouse
        312 North Spring Street
6        Los Angeles, California 90012
        Telephone: (213) 894-0713
7        Facsimile: (213) 894-6269
        E-mail: Richard.Robinson@usdoj.gov
8
   PETER B. LOEWENBERG
9  Senior Trial Attorney (Florida State Bar No.: 170488)
   Fraud Section, Criminal Division
10 U.S. Department of Justice
        1400 New York Avenue, NW
11       Washington, D.C. 20005
        Telephone: (202) 514-0840
12       E-mail: Peter.Loewenberg@usdoj.gov

13 Attorneys for Plaintiff
   UNITED STATES OF AMERICA
14

15              UNITED STATES DISTRICT COURT

16         FOR THE CENTRAL DISTRICT OF CALIFORNIA

17

18 UNITED STATES OF AMERICA,        )  CR No. 10- 00731
                                    )
19              Plaintiff,          )  PLEA AGREEMENT FOR DEFENDANT
                                    )  UNIVISION SERVICES, INC.
20         v.                       )
                                    )
21 UNIVISION SERVICES, INC.,        )
                                    )
22         Defendant.               )
                                    )
23 _____)

24      1.  This constitutes the binding plea agreement between

25 UNIVISION SERVICES, INC. ("defendant"), the successor in interest

26 of Univision Music Group with respect to the conduct described in

27 Exhibit C to this agreement (the "Investigated Conduct"), and the

28 United States Attorney's Office for the Central District of

California ("the USAO") and the Criminal Division of the United States Department of Justice (collectively, the "Offices") in the above-captioned case. This agreement is limited to the Offices and cannot bind any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authorities.

## DEFENDANT'S OBLIGATIONS

2. Defendant agrees to:

(a) give up the right to indictment by a grand jury and, at the earliest opportunity provided by the Court, appear and plead guilty to a one-count information in the form attached to this agreement as Exhibit A or a substantially similar form. Defendant enters into this agreement, and will enter its guilty plea before the Court, through an officer, agent, or attorney authorized to so act by a duly-enacted resolution of defendant's Board of Directors, in the form attached hereto as Exhibit B or a substantially similar form;

(b) abide by all agreements regarding facts and sentencing factors contained in this agreement;

(c) appear for all court appearances and obey any other ongoing court order in this matter;

(d) not commit any crime;

(e) be truthful at all times with Pretrial Services, the United States Probation Office, and the Court; and

(f) pay the applicable special assessment at or before the time of sentencing.

3. Defendant further agrees to cooperate fully with the

Offices, the United States Postal Inspection Service and, as directed by the Offices, any other federal, state, or local law enforcement agency. As used in this Agreement, "cooperation" requires defendant:

(a) to provide complete and truthful disclosure of all non-privileged information as may be requested by the Offices with respect to the activities of defendant and its present and former officers, employees, and agents, and any other persons or entities, concerning any matters relating to the Investigated Conduct;

(b) to assemble, organize, and provide all non-privileged documents, records, or other tangible evidence in defendant's possession, custody, or control wherever located, concerning any matters relating to the Investigated Conduct;

(c) to provide all translations defendant possesses, controls, creates, or obtains of any Spanish language documents produced by defendant and to secure, at its own expense, translations from a mutually acceptable third-party translation service of any Spanish language documents produced by defendant, as may be requested by the Offices, provided, however, that:

(i) defendant's obligation under this paragraph 3(c) shall cease when the total cost of such translations exceeds $50,000; and

(ii) with respect to any documents identified by the Offices as requiring third party translation, defendant will provide to the Offices the cost estimate of the mutually acceptable third-party translation service for the translation of the identified documents and secure the Offices' agreement to use

3

1 that translation service prior to engaging such services; to the

2 extent the Offices can secure a lower price for such

3 translation(s), the Offices may obtain such translation services

4 and defendant shall reimburse the Offices for the cost of such

5 services as invoiced to the Offices.

6       (d) to use its best efforts to facilitate the

7 availability of its present and former officers, employees, and

8 agents to provide information and/or testimony as requested by

9 the Offices, including attendance at all witness interviews,

10 grand jury sessions, trials, and other proceedings; and

11       (e) to provide non-privileged testimony and other

12 information deemed necessary by the Offices or a court to

13 identify or establish the original location, authenticity, or

14 other evidentiary foundation necessary to admit into evidence

15 documents in any proceeding as requested by the Offices.

16    Nothing in this agreement, however, shall require defendant

17 to waive any protections of the attorney-client privilege,

18 attorney work-product doctrine, or any other applicable

19 privilege.

20                 THE OFFICES' OBLIGATIONS

21    4.   The Offices agree to:

22       (a) abide by all agreements regarding facts and

23 sentencing factors contained in this agreement;

24       (b) at the time of sentencing, provided that defendant

25 demonstrates an acceptance of responsibility for the offense up

26 to and including the time of sentencing, recommend a two-level

27 reduction in the applicable Sentencing Guideline culpability

28 score, pursuant to U.S.S.G. § 8C2.5(g)(2);

1     (c) except for criminal tax violations (including

2  conspiracy to commit such violations chargeable under 18 U.S.C.

3  § 371), not further prosecute defendant for violations of federal

4  criminal law arising out of the Investigated Conduct.  Defendant

5  understands that the Offices are free to prosecute defendant for

6  any other unlawful past conduct or any unlawful conduct that

7  occurs after the date of this agreement.  Defendant agrees that

8  at the time of sentencing the Court may consider the uncharged

9  conduct in determining the applicable Sentencing Guidelines

10  range, the propriety and extent of any departure from that range,

11  and the determination of the sentence to be imposed after

12  consideration of the Sentencing Guidelines and all other relevant

13  factors under 18 U.S.C. § 3553(a);

14     (d)  not to offer as evidence in its case-in-chief in

15  the above-captioned case or any other prosecution that may be

16  brought against defendant by the Offices, or in connection with

17  any sentencing proceeding in any case that may be brought against

18  defendant by the Offices, any statements made by defendant or

19  documents, records, or tangible evidence provided by defendant

20  pursuant to this agreement.  Defendant agrees, however, that the

21  Offices may use such statements, documents, records, and tangible

22  evidence: (i) to obtain and pursue leads to other evidence, which

23  evidence may be used for any purpose, including any prosecution

24  of defendant; (ii) to cross-examine defendant should defendant

25  testify, or to rebut any evidence, argument or representations

26  made by defendant or a witness called by defendant in any trial,

27  sentencing hearing, or other court proceeding; and (iii) in any

28  prosecution of defendant for false statement, obstruction of

5

1 justice, or perjury; and

2       (e)  not to use any information provided by defendant
3 pursuant to this agreement against defendant at sentencing for
4 the purpose of determining the applicable guideline range,
5 including the appropriateness of an upward departure, and to
6 recommend to the Court that such information not be used in
7 determining the sentence to be imposed. Defendant understands,
8 however, that information provided by defendant pursuant to this
9 agreement will be disclosed to the Probation Office and the
10 Court, and that the Court may use this information for the
11 purposes set forth in U.S.S.G. § 1B1.8(b) and for determining the
12 sentence to be imposed.

13 NATURE OF THE OFFENSE

14    5.  Defendant understands that for defendant to be guilty
15 of the crime charged in count one (violation of Title 18, United
16 States Code, Section 371), the following must be true:

17    First, beginning in or about 2002, and continuing through in
18 or about September 2006, there was an agreement between two or
19 more persons to commit mail fraud, as charged in the information,
20 by using commercial interstate carriers to execute a scheme to
21 defraud radio stations as to material matters and to obtain money
22 and property from radio stations by means of material false and
23 fraudulent pretenses, representations, and promises, and the
24 concealment of material facts, in violation of Title 18, United
25 State Code, Section 1341.

26    Second, Univision Music Group, acting through one or more of
27 its employees, became a member of the conspiracy, that is,
28 Univision Music Group joined in the illegal agreement, knowing of

6

1 | its objects and intending to help accomplish them.

2 |     Third, one of the members of the conspiracy performed at
3 | least one overt act for the purpose of carrying out the
4 | conspiracy.

5 |     Fourth, defendant is criminally liable for the conduct of
6 | Univision Music Group with respect to the conspiracy.

7 | PENALTIES

8 |     6.   Defendant understands that the statutory maximum
9 | sentence that the Court can impose on an organization for the
10 | offense to which defendant is pleading guilty is: (a) a fine of
11 | $500,000 or twice the gross gain or twice the gross loss
12 | resulting from the offense, whichever is greatest; (b) a term of
13 | probation of five years; and (c) a mandatory special assessment
14 | of $400.

15 |     7.   As part of this binding plea agreement, defendant and
16 | the Offices agree that an order of restitution is not appropriate
17 | in this case because it would be impracticable to identify
18 | specific victims and quantify a respective pecuniary loss to each
19 | of them sustained as a result of defendant's conduct.

20 |     8.   Defendant understands that the conviction in this case
21 | may subject defendant to various collateral consequences,
22 | including but not limited to suspension or revocation of a
23 | license.  Defendant understands and agrees that unanticipated
24 | collateral consequences will not serve as grounds to withdraw
25 | defendant's guilty plea.

26 | FACTUAL BASIS

27 |     9.   Defendant and the Offices agree to the statement of
28 | facts attached hereto as Exhibit C.  Defendant and the Offices

1   agree that this statement of facts is sufficient to support a

2   plea of guilty to the charge described in this agreement and to

3   establish the Sentencing Guidelines factors set forth in

4   paragraph 11 below, but is not meant to be a complete recitation

5   of all facts relevant to the underlying criminal conduct or all

6   facts known to either party that relate to that conduct.

7                        SENTENCING FACTORS

8        10.  Defendant understands that in determining defendant's

9   sentence the Court is required to consider the factors set forth

10  in 18 U.S.C. § 3553(a)(1)-(7), including the kinds of sentence

11  and sentencing range established under the United States

12  Sentencing Guidelines.  Defendant understands that the Sentencing

13  Guidelines are advisory only.

14       11.  Defendant and the Offices agree to the following

15  applicable Sentencing Guidelines factors:

16            (a)  Offense Level: The base offense level for

17  conspiracy to commit mail fraud is 6, pursuant to U.S.S.G.

18  §§ 2B1.1 and 2X1.1.  This is increased 2 levels because the

19  offense involved more than 10 and less than 50 victims, pursuant

20  to U.S.S.G. § 2B1.1(b)(2)(A).  It is increased 2 additional

21  levels because the execution and concealment of the offense

22  involved sophisticated means, pursuant to U.S.S.G.

23  § 2B1.1(b)(9)(c).  The parties agree that no reduction is

24  applicable pursuant to U.S.S.G. § 2X1.1(b)(2), because all the

25  acts necessary for the successful completion of the substantive

26  offense were completed by the co-conspirators.  This results in

27  an offense level of 10, pursuant to U.S.S.G. § 8C2.3.

28            (b)  Base Fine: The base fine is $20,000, which

                                    8

1  corresponds to an offense level of 10, pursuant to § 8C2.4(a),

2  (d). The parties agree that calculation of pecuniary gain or

3  pecuniary loss would unduly complicate or prolong the sentencing

4  process, and therefore gain or loss should not be used for

5  determination of the base fine, pursuant to § 8C2.4(c).

6  (c) Culpability Score: Defendant starts with a

7  culpability score of 5 points, pursuant to § 8C2.5(a). Because

8  the entity that engaged in the offense conduct was an

9  organization that had more than 50 and less than 200 employees

10  and an individual within substantial authority personnel

11  participated in, condoned, or was willfully ignorant of the

12  offense, this is increased 2 points, pursuant to U.S.S.G.

13  § 8C2.5(b)(4). Because Fonovisa Inc. participated in the

14  conspiracy less than 5 years after a criminal adjudication based

15  on similar misconduct, this is increased 2 points, pursuant to

16  U.S.S.G. § 8C2.5(c)(2). The conduct by Fonovisa Inc. giving rise

17  to this enhancement took place prior to the acquisition of

18  Fonovisa Inc. by any entity affiliated with defendant and the

19  incorporation of Fonovisa Inc. into Univision Music Group. The

20  parties agree that the adjustments to the culpability score that

21  are available under §§ 8C2.5(d) through 8C2.5(f) are

22  inapplicable. Provided that defendant demonstrates an acceptance

23  of responsibility for the offense up to and including the time of

24  sentencing, the parties recommend that 2 points be subtracted,

25  under U.S.S.G. § 8C2.5(g)(2), because defendant fully cooperated

26  in the investigation and clearly demonstrated recognition and

27  acceptance of responsibility. Defendant's cooperation was

28  exemplified by its self-reporting of the matters covered by this

9

1  plea and included the voluntary production of thousands of

2  documents. Thus, defendant's total culpability score is 7

3  points.

4        (d) <u>Fine Range</u>: Under U.S.S.G. § 8C2.6, the minimum and

5  maximum multipliers for a defendant with a culpability score of 7

6  are 1.40 and 2.80, respectively. Applying these multipliers to

7  the base fine of $20,000 results in an advisory fine range of

8  $28,000 to $56,000. The parties agree that the long running

9  nature of the offense, the frequency and magnitude of the amounts

10 of money spent on undisclosed illegal cash consideration to radio

11 station programmers, and the resulting risk to the integrity of

12 the market for on-air broadcast of music program material on

13 radio stations are aggravating circumstances of a kind and to a

14 degree not adequately taken into consideration by the Sentencing

15 Commission in formulating the Sentencing Guidelines.

16 Accordingly, and as part of this binding plea agreement,

17 defendant and the Offices agree that an appropriate disposition

18 of this case is that the Court depart upward from the otherwise

19 applicable advisory fine range to a fine of $500,000 (the

20 statutory maximum for the offense of conviction), pursuant to

21 § 8C4.5, which amount defendant represents it has the ability to

22 pay immediately.

23       (e) <u>Organizational Probation</u>: The parties do not

24 believe that a term of probation, pursuant to U.S.S.G. § 8D1.1,

25 is warranted because (i) defendant agrees to pay the entire

26 agreed upon $500,000 fine by the time of sentencing; and (ii)

27 defendant and its affiliated entities have ceased engaging in the

28 business of producing, marketing, promoting, and/or selling

records or other music media to the public (and therefore have no incentive to manipulate radio station air-play of music programming).

(f) <u>Remedial Order</u>: The parties do not believe that a remedial order, pursuant to U.S.S.G. § 8B1.2, is warranted, given the cessation of music-related business described in paragraph 11(e) above.

(g) <u>Community Service</u>: The parties do not believe that a term of community service, pursuant to U.S.S.G. § 8B1.3, is warranted, given defendant's and its affiliated entities' cessation of music-related business, as described in paragraph 11(e) above.

12. The Court will determine the facts and advisory Sentencing Guideline calculations relevant to sentencing and decide whether to agree to be bound by this agreement. Both defendant and the Offices are free to: (a) supplement the facts by supplying relevant information to the United States Probation Office and the Court; and (b) correct any and all factual misstatements relating to the calculation of the sentence.

13. Defendant understands and agrees that this agreement is entered into pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C). So long as defendant does not breach the agreement, defendant may withdraw from this agreement and render it null and void if the Court refuses to be bound by this agreement. The Offices may also, in their discretion, withdraw from this agreement and render it null and void if the defendant breaches this agreement or if Court refuses to be bound by this agreement.

## WAIVER OF CONSTITUTIONAL RIGHTS

14.   Defendant understands that by pleading guilty, defendant gives up the following rights:

(a)  the right to persist in a plea of not guilty;

(b)  the right to a speedy and public trial by jury;

(c)  the right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt;

(d)  the right to confront and cross-examine witnesses against defendant;

(e)  the right to present evidence in opposition to the charge, including calling witnesses and subpoenaing those witnesses to testify;

(f)  the right, if defendant chose not to present evidence, to have that choice not be used against defendant; and

(g)  any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

## WAIVER OF APPEAL OF CONVICTION

15.   Defendant understands that, with the exception of an appeal based on a claim that defendant's guilty plea was involuntary, by pleading guilty defendant is waiving and giving up any right to appeal defendant's conviction on the offense to which defendant is pleading guilty.

## BREACH OF AGREEMENT

16.   If defendant, at any time after the execution of this agreement, knowingly violates or fails to perform any of defendant's agreements or obligations under this agreement ("a

12

1  breach"), the Offices may declare this agreement breached.  If
2  the Offices declare this agreement breached at any time following
3  its execution, and the Court finds such a breach to have
4  occurred, then: (a) if defendant has previously entered a guilty
5  plea, defendant will not be able to withdraw the guilty plea; and
6  (b) the Offices will be relieved of all of their obligations
7  under this agreement.

8     17.  Following the Court's finding of a knowing and willful
9  breach of this agreement by defendant, should the Offices elect
10 to pursue any charge that was not filed as a result of this
11 agreement, then:

12      (a) defendant agrees that any applicable statute of
13 limitations is tolled between the date of defendant's signing of
14 this agreement and the commencement of any such prosecution or
15 action;

16      (b) defendant gives up all defenses based on the
17 statute of limitations, any claim of pre-indictment delay, or any
18 speedy trial claim with respect to any such prosecution, except
19 to the extent that such defenses existed as of the date of
20 defendant's signing this agreement; and

21      (c) defendant agrees that: (i) any statements made by
22 defendant, under oath, at the guilty plea hearing (if such a
23 hearing occurred prior to the breach); (ii) the stipulated
24 factual basis statement in this agreement; and (iii) any evidence
25 derived from such statements, are admissible against defendant in
26 any such prosecution of defendant, and defendant shall assert no
27 claim under the United States Constitution, any statute, Rule 410
28 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules

1 | of Criminal Procedure, or any other federal rule, that the
2 | statements or any evidence derived from any statements should be
3 | suppressed or are inadmissible.

### LIMITED MUTUAL WAIVER OF APPEAL

4
5 | 18.   Defendant gives up the right to appeal any sentence
6 | imposed by the Court and the manner in which the sentence is
7 | determined, provided that the fine amount imposed by the Court
8 | does not exceed the amount specified in paragraph 11(d) above and
9 | the sentence is constitutional.

10 | 19.   The Offices give up their right to appeal the sentence,
11 | and the manner in which the sentence is determined, provided that
12 | a fine is imposed by the Court that is within the statutory
13 | maximum specified above and the sentence is constitutional.

### COURT NOT A PARTY

14
15 | 20.   The Court is not a party to this agreement and need not
16 | accept any of the Offices' sentencing recommendations or the
17 | parties' stipulations.

### NO ADDITIONAL AGREEMENTS

18
19 | 21.   Except as set forth herein, there are no promises,
20 | understandings, or agreements between the Offices and defendant
21 | or defendant's counsel.   Nor may any additional agreement,
22 | understanding, or condition be entered into unless in a writing
23 | signed by all parties or on the record in court.

### PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

24
25 | 22.   The parties agree and stipulate that this agreement
26 | will be considered part of the record of defendant's guilty plea
27 | hearing as if the entire agreement had been read into the record
28 | of the proceeding.

14

1    This agreement is effective upon signatures by defendant and

2 an Assistant United States Attorney for the Central District of

3 California and a Trial Attorney for the Criminal Division of the

4 United States Department of Justice.

5 AGREED AND ACCEPTED

6 UNITED STATES DEPARTMENT OF JUSTICE:

7

8 PETER B. LOEWENBERG                                      Date 4/22/10
  Senior Trial Attorney,
9 Fraud Section, Criminal Division
  United States Department of Justice

10

   UNITED STATES ATTORNEY'S OFFICE
11 FOR THE CENTRAL DISTRICT OF CALIFORNIA

12

13 RICHARD E. ROBINSON                                     Date 5/3/10
   Assistant United States Attorney
14 Major Frauds Section, Criminal Division

15

16    I, Doug Kranwinkle, in my capacity as general counsel of

17 defendant Univision Services, Inc. ("Univision"), am authorized

   to enter into this plea agreement on behalf of Univision and bind
18
   Univision to it.  I have obtained proper written authorization to
19
   do so from the Univision Board of Directors, in the form of the
20
   Univision board resolution attached as Exhibit B to this
21
   agreement.  The members of the Univision Board of Directors have
22
   carefully reviewed every part of this agreement with Univision's
23
   attorneys and me.  I understand the terms of this agreement, and,
24
   on behalf of Univision, I voluntarily agree to them.  Before
25
   signing this agreement, I consulted with Univision's attorneys.
26
   Those attorneys fully advised Univision and me of Univision's
27
   rights, of possible defenses, of the Sentencing Guidelines
28
   provisions, and of the consequences of entering into this

15

1  agreement.   No other promises or inducements have been made to

2  Univision or me, other than those contained in this agreement.

3  Furthermore, no one has threatened or forced Univision or me, on

4  Univision's behalf, in any way to enter into this agreement.

5  Finally, on behalf of Univision, I am satisfied with the

6  representation of counsel which Univision received in this

7  matter.

8

9  _____        $5-10-10$

   DOUG KRANWINKLE                            Date

10 General Counsel

   UNIVISION SERVICES, INC.

11

12     I, Gordon A. Greenberg, a member of the law firm McDermott

13 Will & Emery LLP, am counsel of record in this case for defendant

14 Univision Services, Inc. ("Univision").   I have carefully

15 reviewed every part of this agreement with Univision.   Further, I

16 have fully advised Univision of its rights, of possible defenses,

17 of the Sentencing Guideline provisions, and of the consequences

18 of entering into this agreement.   I believe that DOUG KRANWINKLE

19 is general counsel of Univision and is duly authorized to enter

20 into this agreement on behalf of Univision.   To the best of my

21 knowledge and belief, Univision's decision to enter into this

22 agreement is an informed and voluntary one.

23

24 _____        6|2|10

   GORDON A. GREENBERG                        Date

25 McDermott Will & Emery LLP

   Counsel for UNIVISION SERVICES, INC.

26

27

28

16

**EXHIBIT A TO PLEA AGREEMENT OF UNIVISION SERVICES, INC.**

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR 10- _____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | **I N F O R M A T I O N** |
| v. | ) | |
| | ) | [18 U.S.C. § 371: Conspiracy] |
| UNIVISION SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

The United States Attorney charges:

[18 U.S.C. § 371]

INTRODUCTORY ALLEGATIONS

DEFENDANT UNIVISION SERVICES, INC.

1.    Defendant UNIVISION SERVICES, INC. ("defendant UNIVISION") is a Delaware corporation with its principal place of business in Los Angeles, California.  Defendant UNIVISION is a wholly-owned subsidiary of Univision Communications Inc. ("UCI").

2.    Defendant UNIVISION is in the business of addressing certain obligations arising from UCI's sale of all interests in

the Latin music recording and publishing businesses conducted
under the name Univision Music Group ("UMG") to an unrelated
entity.  Defendant UNIVISION has assumed the criminal liability
of UMG as a consequence of UCI's sale of the UMG businesses to an
innocent third party and because none of the UMG employees and
other co-conspirators referenced in this Information are
presently employed by UCI or its affiliates.

     3.   At all times relevant to this Information:

UNIVISION MUSIC GROUP

     a.   UMG maintained its principal place of business in
Los Angeles, California.

     b.   Co-Conspirators 1 through 4 were high level UMG
executives whose duties included managing and directing UMG
employees in the promotion of UMG's records.

     c.   Co-Conspirators 5 and 6 were mid level UMG
employees whose duties included promoting UMG's records.  Co-
conspirator 5 maintained a personal bank account at Bank of
America, bearing account number xxxxx-xx492 ("BoA Account").

     d.   Co-conspirator 7 was an independent record
promoter who contracted with UMG to promote UMG's records.

     e.   Co-Conspirator 8 was a program manager of a radio
station in Northern California.

RADIO STATION PROGRAM MANAGERS AND DISCLOSURE OBLIGATIONS

     f.   Radio station program managers ("program
managers") were employees of radio stations whose duties
included, among other things, making programming decisions
affecting the selection for on-air broadcast of music program
material, consistent with the interests of their employer

2

1  stations.

2      g.    The Communications Act of 1934, as amended, 47

3  U.S.C. §§ 317 and 508, and regulations promulgated by the Federal

4  Communications Commission, required that, as a general matter,

5  all matter broadcast by a radio station for which any person has

6  paid or promised to pay any consideration to the station shall,

7  at the same time it is so broadcast, be publicly announced as

8  paid for or furnished, as the case may be, by such person.

9  Program managers were, as a general matter, obligated to disclose

10  to the station any consideration that they have been paid or

11  promised for the broadcast of matter over the station and, to the

12  extent the station received such a report from a program manager

13  in a situation where an announcement would have been required had

14  the consideration been received by the station, the station was

15  required to make an appropriate public announcement.

16                     OBJECT OF THE CONSPIRACY

17      4.    Beginning in or about 2002, and continuing through in

18  or about September 2006, in Los Angeles County, within the

19  Central District of California, and elsewhere, UMG, to which

20  defendant UNIVISION is the successor in interest with respect to

21  criminal liability, together with others known and unknown to the

22  United States Attorney, knowingly combined, conspired, and agreed

23  to commit the following offense against the United States: To use

24  commercial interstate carriers to execute a scheme to defraud

25  radio stations as to material matters and to obtain money and

26  property from radio stations by means of material false and

27  fraudulent pretenses, representations, and promises, and the

28  concealment of material facts, in violation of Title 18, United

3

State Code, Section 1341.

## MANNER AND MEANS OF THE CONSPIRACY

5. The objects of the conspiracy were carried out, and to be carried out, in substance, as follows:

a. UMG, through its conspiring employees and agents, would pay illegal undisclosed cash consideration to co-conspirator program managers employed at radio stations located throughout the United States, whose primary broadcast format was Latin music. The purpose of these cash payments was to induce the program managers to play or increase the air play of UMG's records, without UMG having to pay the radio stations fees charged for such broadcast of UMG's records that would have had to have been disclosed to the listening public.

b. The co-conspirator program managers would conceal from their radio stations the illegal cash consideration that UMG paid them, in violation of their obligations to disclose to their employers consideration paid to them for broadcast of matter over their stations.

c. UMG and its co-conspirators would raise off-the-books cash to pay the illegal undisclosed cash consideration to the radio station programmers by having co-conspirator independent record promoters send invoices to UMG for specified dollar amounts for purported promotional activities for particular UMG records. The invoiced promotional services would not be provided and were never intended by UMG or the co-conspirator record promoters to be provided. The amounts of the invoices would include commissions for the co-conspirator record promoters. The fraudulent invoices would be approved for payment

4

by Co-conspirators 1, 2, and 3, on the false pretense that the invoices were for legitimate promotional services.   Co-conspirators 1, 2, and 3 would then cause UMG to issue checks to the co-conspirator record promoters for payment of the fraudulent invoices.   The UMG checks would typically be sent from UMG in Los Angeles, California, to the co-conspirator record promoters, via a commercial interstate carrier, such as FedEx Corporation ("FedEx").

          d.    Co-conspirators 1, 2, and 3 would tell the co-conspirator record promoters the amounts of cash needed for UMG's payments of illegal undisclosed cash consideration to the co-conspirator program managers.   The co-conspirator record promoters would then negotiate the UMG checks to obtain the needed funds (typically tens of thousands of dollars per instance) and provide the proceeds in cash to co-conspirator UMG employees, including Co-conspirators 2, 4, and 6.

          e.    Co-conspirator 7, in particular, would personally deliver to one or more co-conspirator UMG employees the proceeds he had obtained from negotiating UMG checks issued to pay his fraudulent invoices.   Co-conspirator 7 would often travel by air, carrying tens of thousands of dollars of cash in his briefcase, to deliver the proceeds to co-conspirator UMG employees in Los Angeles, California.   In some instances, Co-conspirator 4 would travel to New York to receive the cash directly from Co-conspirator 7.

          f.    Co-conspirators 2 and 6, in supervising distribution of the illegal undisclosed cash consideration to co-conspirator program managers, would divide the cash into bundles

5

of between $1,000 to $10,000, depending upon the program manager to be paid and the importance of his or her radio station to UMG. The cash would then be secretly delivered to those program managers by co-conspirator UMG employees, including Co-conspirators 2 and 5. In some instances, Co-conspirator 7 would secretly deliver cash directly to co-conspirator program managers, at the request of co-conspirator UMG employees.

g. Some program managers who accepted the illegal undisclosed cash consideration from UMG would instruct the co-conspirator UMG employees to deposit their cash directly into offshore bank accounts that the co-conspirator program managers maintained.

## OVERT ACTS

6. In furtherance of the conspiracy, and to accomplish its objects, UMG, together with others known and unknown to the United States Attorney, committed and willfully caused others to commit the following overt acts, among others, in the Central District of California and elsewhere:

Overt Act No. 1: On or about February 9, 2006, in Los Angeles, California, Co-conspirator 4 caused a UMG check for $157,800 to be sent and delivered to Co-conspirator 7 in New York, New York, by FedEx Corporation, a commercial interstate carrier, as payment for a fraudulent invoice, of which approximately $120,000 was to be returned to UMG in cash to fund UMG's payments of illegal undisclosed cash consideration to various co-conspirator program managers.

Overt Act No. 2: On or about March 4, 2006, in and around the El Paso, Texas area, using UMG monies obtained through

6

1  Co-conspirator 7, Co-conspirator 2 delivered $3,000 in cash to a
2  co-conspirator program manager.

3      Overt Act No. 3:  On or about March 28, 2006, in and around
4  the San Antonio, Texas area, using UMG monies obtained through
5  Co-conspirator 7, Co-conspirator 2 delivered $4,000 in cash to a
6  co-conspirator program manager.

7      Overt Act No. 4:  On or about April 2, 2006, in and around
8  the El Paso, Texas area, using UMG monies obtained through
9  Co-conspirator 7, Co-conspirator 2 delivered $3,000 in cash to a
10  co-conspirator program manager.

11      Overt Act No. 5:  On or about April 5, 2006, in Los Angeles,
12  California, Co-conspirator 2, using UMG monies obtained through
13  Co-conspirator 7, deposited $10,000 into Co-conspirator 5's BoA
14  Account, to fund UMG's payments of illegal undisclosed cash
15  consideration to co-conspirator program managers.

16      Overt Act No. 6:  On or about April 27, 2006, in and around
17  the San Antonio, Texas area, Co-conspirator 2, using UMG monies
18  obtained through Co-conspirator 7, delivered $4,000 in cash to a
19  co-conspirator program manager.

20      Overt Act No. 7:  On or about April 28, 2006, in and around
21  the El Paso, Texas area, Co-conspirator 2, using UMG monies
22  obtained through Co-conspirator 7, delivered $3,000 in cash to a
23  co-conspirator program manager.

24      Overt Act No. 8:  On or about May 11, 2006, in Los Angeles,
25  California, Co-conspirator 2, using UMG monies obtained through
26  Co-conspirator 7, deposited $10,000 into Co-conspirator 5's BoA
27  Account, to fund UMG's payments of illegal undisclosed cash
28  consideration to co-conspirator program managers.

1    Overt Act No. 9: On or about May 31, 2006, in and around
2  the San Antonio, Texas area, Co-conspirator 2, using UMG monies
3  obtained through Co-conspirator 7, delivered $4,000 in cash to a
4  co-conspirator program manager.

5    Overt Act No. 10: On or about June 3, 2006, in and around
6  the El Paso, Texas area, Co-conspirator 2, using UMG monies
7  obtained through Co-conspirator 7, delivered $3,000 in cash to a
8  co-conspirator program manager.

9    Overt Act No. 11: On or about June 16, 2006, in Los Angeles,
10  California, Co-conspirator 2, using UMG monies obtained through
11  Co-conspirator 7, deposited $10,000 into Co-conspirator 5's BoA
12  Account, to fund UMG's payments of illegal undisclosed cash
13  consideration to co-conspirator program managers.

14    Overt Act No. 12: On or about June 28, 2006, in or around
15  the Sacramento, California area, Co-conspirator 2, using monies
16  obtained through Co-conspirator 7, delivered $4,000 in cash to
17  Co-conspirator 8.

18    Overt Act No. 13: On or about July 13, 2006, in Los Angeles,
19  California, Co-conspirator 6, using UMG monies obtained through
20  Co-conspirator 7, deposited $8,000 into Co-conspirator 5's BoA
21  Account, to fund UMG's payments of illegal undisclosed cash
22  consideration to co-conspirator program managers.

23    Overt Act No. 14: On or about August 17, 2006, in Los
24  Angeles, California, Co-conspirator 6, using UMG monies obtained
25  through Co-conspirator 7, deposited $9,000 into Co-conspirator
26  5's BoA Account, to fund UMG's payments of illegal undisclosed
27  cash consideration to co-conspirator program managers.

28    Overt Act No. 15: On or about September 18, 2006, in Los

8

1   Angeles, California, Co-conspirator 6, using UMG monies obtained

2   through Co-conspirator 7, deposited $9,000 into Co-conspirator

3   5's BoA Account, to fund UMG's payments of illegal undisclosed

4   cash consideration to co-conspirator program managers.

5

6                                   ANDRÉ BIROTTE JR.
                                    United States Attorney
7

8
                                    CHRISTINE C. EWELL
9                                   Assistant United States Attorney
                                    Chief, Criminal Division
10
                                    BEONG-SOO KIM
11                                  Assistant United States Attorney
                                    Acting Chief, Major Frauds Section
12
                                    RANEE KATZENSTEIN
13                                  Assistant United States Attorney
                                    Deputy Chief, Major Frauds Section
14
                                    RICHARD E. ROBINSON
15                                  Assistant United States Attorney
                                    Major Frauds Section
16                                  Central District of California

17

18                                  DENNIS MCINERNEY
                                    Chief, Fraud Section,
19                                  Criminal Division
                                    United States Department of Justice
20

21                                  PETER B. LOEWENBERG
                                    Senior Trial Attorney
22                                  Fraud Section, Criminal Division
                                    United States Department of Justice
23
                                    CARLA CONOVER
24                                  Special Assistant United States
                                    Attorney
25

26

27

28

                                        9

EXHIBIT C TO PLEA AGREEMENT OF UNIVISION SERVICES, INC.

STATEMENT OF ADMITTED FACTS

UNIVISION SERVICES, INC. ("UNIVISION") represents and admits that the following facts are true:

UNIVISION is a Delaware corporation with its principal place of business in Los Angeles, California.  UNIVISION is a wholly-owned subsidiary of Univision Communications Inc. ("UCI").

UNIVISION is in the business of addressing certain obligations arising from UCI's sale of all interests in the Latin music recording and publishing businesses conducted under the name Univision Music Group ("UMG") to an unrelated entity. UNIVISION has assumed the criminal liability of UMG as a consequence of UCI's sale of the UMG businesses to an innocent third party and because none of the UMG employees and other co-conspirators referenced in this Information are presently employed by UCI or its affiliates.

From 2002 to 2008, UMG was comprised of a collection of entities including, UMG, Inc., Fonovisa Inc., La Calle Inc. and Disa Holdco LLC among others, which produced Latin music recordings and published music compositions for the Latin music market.

Pursuant to a Purchase Agreement dated as of February 27, 2008 (the "Purchase Agreement"), UCI sold all of its interests in UMG and related stock and assets to an unaffiliated entity.

1

Following the sale, UCI ceased to own any interest in UMG.
However, pursuant to the Purchase Agreement, UCI owed various
obligations including certain promotional, indemnification, and
other obligations to effectuate the transfer of UMG to the buying
entity. Pursuant to an Assignment, Delegation and Assumption
Agreement dated November 2, 2009, UCI transferred to its
subsidiary UNIVISION responsibility for all liability arising
from the participation of UMG employees in the conspiracy.

At relevant times during the period from 2002 through
September 2006:

    a.   UMG maintained its principal place of business in
Los Angeles, California.

    b.   Individuals hereinafter referred to as
"Co-Conspirator 1," "Co-conspirator 2," "Co-conspirator 3," and
"Co-conspirator 4," were high level UMG executives whose duties
included managing and directing UMG employees in the promotion of
UMG's records.

    c.   Individuals hereinafter referred to as
"Co-Conspirator 5" and "Co-conspirator 6" were mid level UMG
employees whose duties included promoting UMG's records. Co-
conspirator 5 maintained a personal bank account at Bank of
America, bearing account number xxxxx-xx492 ("BoA Account").

    d.   The individual hereinafter referred to as "Co-
conspirator 7" was an independent record promoter who contracted

with UMG to promote UMG's records.

e.   The individual hereinafter referred to as "Co-Conspirator 8" was a program manager of a radio station in Northern California.

f.   Radio station program managers ("program managers") were employees of radio stations whose duties included, among other things, making programming decisions affecting the selection for on-air broadcast of music program material, consistent with the interests of their employer stations.

g.   The Communications Act of 1934, as amended, 47 U.S.C. §§ 317 and 508, and regulations promulgated by the Federal Communications Commission, required that, as a general matter, all matter broadcast by a radio station for which any person has paid or promised to pay any consideration to the station shall, at the same time it is so broadcast, be publicly announced as paid for or furnished, as the case may be, by such person. Program managers were, as a general matter, obligated to disclose to the station any consideration that they have been paid or promised for the broadcast of matter over the station and, to the extent the station received such a report from a program manager in a situation where an announcement would have been required had the consideration been received by the station, the station was required to make an appropriate public announcement.

3

Beginning in 2002, and continuing through September 2006, in Los Angeles County, California, and elsewhere, certain UMG officers, executives, and other agents of UMG, knowingly conspired:

a.    To use commercial interstate carriers to execute a scheme to defraud radio stations as to material matters and to obtain money and property from radio stations by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts; and

b.    To use commercial interstate carriers to execute a scheme to defraud radio stations of their right to the honest services of their employees in making programming decisions affecting the selection for on-air broadcast of music program material.

The co-conspirators made secret and illegal cash payments to program managers in exchange for increased radio play time for UMG's records, without required on-air acknowledgments of UMG's sponsorship, or payment of broadcast fees to the radio stations. The co-conspirator UMG officers, executives, and agents used fraudulent invoices and payments to conceal the true nature of the corporate expenditures that funded the cash payments to co-conspirator program managers.

To carry out the conspiracy:

a.    UMG, through its conspiring employees and agents,

4

would pay illegal undisclosed cash consideration to co-
conspirator program managers employed at radio stations located
throughout the United States, whose primary broadcast format was
Latin music.  The purpose of these cash payments was to induce
the program managers to play or increase the air play of UMG's
records, without UMG having to pay the radio stations fees
charged for such broadcast of UMG's records that would have had
to have been disclosed to the listening public.

   b. The co-conspirator program managers would conceal
from their radio stations the illegal cash consideration that UMG
paid them, in violation of their obligations to disclose to their
employers consideration paid to them for broadcast of matter over
their stations.

   c. UMG, through its co-conspiring employees and
agents, would raise off-the-books cash to pay the illegal
undisclosed cash consideration to the radio station programmers
by having co-conspirator independent record promoters send
invoices to UMG for specified dollar amounts for purported
promotional activities for particular UMG records.  The invoiced
promotional services would not be provided and were never
intended by UMG or the co-conspirator record promoters to be
provided.  The amounts of the invoices would include commissions
for the co-conspirator record promoters.  The fraudulent invoices
would be approved for payment by Co-conspirators 1, 2, and 3, on

5

the false pretense that the invoices were for legitimate promotional services. Co-conspirators 1, 2, and 3 would then cause UMG to issue checks to the co-conspirator record promoters for payment of the fraudulent invoices. The UMG checks would typically be sent from UMG in Los Angeles, California, to the co-conspirator record promoters, via a commercial interstate carrier, such as FedEx Corporation ("FedEx").

d. Co-conspirators 1, 2, and 3 would tell the co-conspirator record promoters the amounts of cash needed for UMG's payments of illegal undisclosed cash consideration to the co-conspirator program managers. The co-conspirator record promoters would then negotiate the UMG checks to obtain the needed funds (typically tens of thousands of dollars per instance) and provide the proceeds in cash to co-conspirator UMG employees, including Co-conspirators 2, 4, and 6.

e. Co-conspirator 7, in particular, would personally deliver to one or more co-conspirator UMG employees the proceeds he had obtained from negotiating UMG checks issued to pay his fraudulent invoices. Co-conspirator 7 would often travel by air, carrying tens of thousands of dollars of cash in his briefcase, to deliver the proceeds to co-conspirator UMG employees in Los Angeles, California. In some instances, Co-conspirator 4 would travel to New York to receive the cash directly from Co-conspirator 7.

6

f.     Co-conspirators 2 and 6, in supervising distribution of the illegal undisclosed cash consideration to co-conspirator program managers, would divide the cash into bundles of between $1,000 to $10,000, depending upon the program manager to be paid and the importance of his or her radio station to UMG. The cash would then be secretly delivered to those program managers by co-conspirator UMG employees, including Co-conspirators 2 and 5.  In some instances, Co-conspirator 7 would secretly deliver cash directly to co-conspirator program managers, at the request of co-conspirator UMG employees.

g.     Some program managers who accepted the illegal undisclosed cash consideration from UMG would instruct the co-conspirator UMG employees to deposit their cash directly into offshore bank accounts that the co-conspirator program managers maintained.

In furtherance of the conspiracy, and to accomplish its object, UMG, through its co-conspirator employees and agents, committed and willfully caused others to commit the following overt acts among others:

On or about February 9, 2006, in Los Angeles, California, Co-conspirator 4 caused a UMG check for $157,800 to be sent and delivered to Co-conspirator 7 in New York, New York, by FedEx Corporation, a commercial interstate carrier, as payment for a fraudulent invoice, of which approximately $120,000 was to be

7

returned to UMG in cash to fund UMG's payments of illegal undisclosed cash consideration to various co-conspirator program managers.

On or about March 4, 2006, in and around the El Paso, Texas area, using UMG monies obtained through Co-conspirator 7, Co-conspirator 2 delivered $3,000 in cash to a co-conspirator program manager.

On or about March 28, 2006, in and around the San Antonio, Texas area, using UMG monies obtained through Co-conspirator 7, Co-conspirator 2 delivered $4,000 in cash to a co-conspirator program manager.

On or about April 2, 2006, in and around the El Paso, Texas area, using UMG monies obtained through Co-conspirator 7, Co-conspirator 2 delivered $3,000 in cash to a co-conspirator program manager.

On or about April 5, 2006, in Los Angeles, California, Co-conspirator 2, using UMG monies obtained through Co-conspirator 7, deposited $10,000 into Co-conspirator 5's BoA Account, to fund UMG's payments of illegal undisclosed cash consideration to co-conspirator program managers.

On or about April 27, 2006, in and around the San Antonio, Texas area, Co-conspirator 2, using UMG monies obtained through Co-conspirator 7, delivered $4,000 in cash to a co-conspirator program manager.

8

On or about April 28, 2006, in and around the El Paso, Texas area, Co-conspirator 2, using UMG monies obtained through Co-conspirator 7, delivered $3,000 in cash to a co-conspirator program manager.

On or about May 11, 2006, in Los Angeles, California, Co-conspirator 2, using UMG monies obtained through Co-conspirator 7, deposited $10,000 into Co-conspirator 5's BoA Account, to fund UMG's payments of illegal undisclosed cash consideration to co-conspirator program managers.

On or about May 31, 2006, in and around the San Antonio, Texas area, Co-conspirator 2, using UMG monies obtained through Co-conspirator 7, delivered $4,000 in cash to a co-conspirator program manager.

On or about June 3, 2006, in and around the El Paso, Texas area, Co-conspirator 2, using UMG monies obtained through Co-conspirator 7, delivered $3,000 in cash to a co-conspirator program manager.

On or about June 16, 2006, in Los Angeles, California, Co-conspirator 2, using UMG monies obtained through Co-conspirator 7, deposited $10,000 into Co-conspirator 5's BoA Account, to fund UMG's payments of illegal undisclosed cash consideration to co-conspirator program managers.

On or about June 28, 2006, in or around the Sacramento, California area, Co-conspirator 2, using monies obtained through

Co-conspirator 7, delivered $4,000 in cash to Co-conspirator 8.

On or about July 13, 2006, in Los Angeles, California, Co-conspirator 6, using UMG monies obtained through Co-conspirator 7, deposited $8,000 into Co-conspirator 5's BoA Account, to fund UMG's payments of illegal undisclosed cash consideration to co-conspirator program managers.

On or about August 17, 2006, in Los Angeles, California, Co-conspirator 6, using UMG monies obtained through Co-conspirator 7, deposited $9,000 into Co-conspirator 5's BoA Account, to fund UMG's payments of illegal undisclosed cash consideration to co-conspirator program managers.

On or about September 18, 2006, in Los Angeles, California, Co-conspirator 6, using UMG monies obtained through Co-conspirator 7, deposited $9,000 into Co-conspirator 5's BoA Account, to fund UMG's payments of illegal undisclosed cash consideration to co-conspirator program managers.

The conduct of the conspirators who worked for UMG was in direct violation of the policies of UCI, which forbade paying any consideration for increased radio air play of its recordings. Among several measures that UCI implemented to reinforce its policy, UCI required its employees and executives to attend mandatory quarterly training and certification courses concerning UCI's policy of not paying consideration for increased air play of its recordings.  UCI also required all independent record

10

promoters who performed services for UMG to sign agreements certifying that they would comply with UCI's policy forbidding payment of any consideration in exchange for air play.  UMG required independent record promoters it worked with to sign the required agreements in order to make executives at UCI believe that UCI's policy was being followed by UMG when in fact it was not.  The government's investigation has not discovered evidence that any officers, directors, or employees of UCI or UNIVISION were aware or had reason to be aware of the illegal conduct occurring at UMG.  Nonetheless, UNIVISION acknowledges that the co-conspirator UMG employees participated in the conspiracy knowingly and with intent to defraud, while acting within the scope of their duties and with intent to benefit UMG.

11

<u>CERTIFICATE OF SERVICE BY MAIL</u>

I, **CRISTINA L. WILSON,** declare:

That I am a citizen of the United States and resident or employed in Los Angeles County, California; that my business address is Office of United States Attorney, United States Courthouse, 312 North Spring Street, Los Angeles, California 90012; that I am over the age of eighteen years, and am not a party to the above-entitled action;

That I am employed by the United States Attorney for the Central District of California who is a member of the Bar of the United States District Court for the Central District of California, at whose direction the service by mail described in this Certificate was made; that on **July 7, 2010** I deposited in the U.S. Mail Collection at 312 N. Spring Street, Los Angeles, California, 90012, in the above-entitled action, in an envelope earing the requisite postage, a copy of:

**PLEA AGREEMENT FOR DEFENDANT UNIVISION SERVICES, INC.**

addressed and sent via email/PDF as follows to:

**See Attachment**

at **their** last known address, at which place there is a delivery service by United States mail.

This Certificate is executed on **July 7, 2010** at Los Angeles, California.

I certify under penalty of perjury that the foregoing is true and correct.

CRISTINA L. WILSON

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>ATTACHMENT</u>

**GORDON A. GREENBERG, ESQ.**          COUNSEL FOR UNIVISION SERVICES, INC.
**MCDERMOTT WILL & EMERY**
**2049 CENTURY PARK EAST, #3400**
**LOS ANGELES, CA 90067-3208**


**DOUGLAS KRANWINKLE, ESQ.**          GENERAL COUNSEL FOR UNIVISION SERVICES, INC.
**UNIVISION COMMUNICATIONS**
**5999 CENTER DRIVE**
**LOS ANGELES, CA 90045**